LEVITT & SONS, Inc., v. NUNAN, Com'r
of Internal Revenue.
No. 182.

Circuit Court of Appeals, Second Circuit.
May 22, 1944.

Carl Sherman and Louis Goldring, both of New York City, for petitioner.

I. Henry Kutz, Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Warren F. Wattles, Sp. Assts. to Atty. Gen., of Washington, D. C., for respondent.

Before L. HAND, CHASE and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The question upon this appeal is whether the taxpayer shall be allowed to deduct a payment of $65,000, made to settle a threatened law suit, on the theory that it was "an ordinary and necessary expense" of "carrying on" its "business", (§ 23(a) (1) of the Revenue Act of 1938, 26 U.S.C. A. Int.Rev.Code, § 23(a) (1)); or whether it can use the payment only to increase the "basis" of a gain or loss. An incidental and subsidiary question is whether the payment was a "loss" under § 23(f). The taxpayer is a corporation made up of six shareholders, Abraham Levitt and his wife, and their two sons, William J., and Alfred S., and the sons' respective wives. The business began in 1930 as a partnership, dealing in real estate and engaged in building. It was incorporated in 1931, and it and two other corporations were merged to form the taxpayer in 1938. Among the assets which came into its hands were parcels of land and the proceeds from the sale of parcels of land, which had been formerly owned by a corporation, known as Rockville Center Community Corporation, which it will be more convenient to speak of merely as "Rockville." That company had been incorporated in 1927, and in 1930 Abraham Levitt was its president, treasurer and general manager, and owned twenty-five per cent of its shares. "Rockville" had held a tract of land on Long Island, New York, which it divided into lots, and sold to builders. It was what is ordinarily called a "land development" company, plotting out a gross acreage, putting in roads and the like, and disposing of the lots piecemeal. The Levitts bought about 150 of these lots, between December 1930 and May 1932, paying on the average about $600 a lot, putting up buildings, and selling them as residences. The whole purchase price of these was substantially $85,-000 which the Levitts paid in full: $7500 in cash, $12,000 by cancelling a debt of "Rockville" to Abraham, and the balance by transfer of purchase money mortgages taken from the buyers. Thereafter the Levitts extended their operations to other parts of Long Island. In these they were extremely successful; by 1938 the business had increased to two millions a year. In the second half of the year 1939 one, Edelman, made demand upon the taxpayers for an accounting to "Rockville" of certain unspecified real property, and proceeds from the sale of real property, then in the taxpayer's possession. This claim was exceedingly hazy, and neither Edelman nor his lawyer ever made its basis clear. However —certainly upon this appeal—it must be taken as an assertion that Abraham Levitt, as manager and president of "Rockville," had abused his trust, had obtained the lots as a result, and that any profits later made by the successors of the firm out of the sale

of the lots, and of the subsequent use of their proceeds, in equity belonged to "Rockville." The fact that Edelman threatened to apply for a receiver lent much color to this interpretation of his claim; and there is little doubt that the taxpayer so understood the cloudy intimations in which it was enveloped.

The Levitts retained an attorney who examined the facts and reported that the claim was utterly baseless and made in bad faith; in substance, merely ‚blackmail. However, an accountant whom they had long employed and whose judgment they trusted, thought that the company could not afford to be subjected to the dangers of such a suit, regardless of its lack of merit. Its affairs were in solution, and precipitation might ruin them; it had on hand many unfinished transactions, sales, building contracts, and the like, and a shock to its credit might prove far more disastrous than a large sum paid in settlement, however unnecessary that was actually to protect its title. This argument prevailed, and Edelman was paid 65,000 for a release by himself and those whom he represented. The Tax Court concluded that the claim had been "to recover from petitioner property to which it had no title. And, if the agreement to pay * * * was to settle a claim of that nature, the payment must be regarded as a payment to get rid of a claim against some of the assets of petitioner." Again, that the claim was "against petitioner as the recipient of property and proceeds * * * which Edelman believed should have gone to stockholders of Rockville." It also held (as an alternative we must suppose), that "to incur an expense to avoid such uncertain contingencies as petitioner's officers believed would result if Edelman filed an action * * * involving such groundless claims was neither an ordinary or" (sic) "a necessary step for petitioner to take in the conduct of its business."

■ Since 1916 the Treasury has had a regulation that "The cost of defending or perfecting a title to property constitutes a part of the cost of the property and is not a deductible expense." Art. 24-2, Reg. 86. There can be no question of its validity, and the courts have applied it in a number of instances to situations in which a taxpayer has either settled a claim to property in his possession, or paid the expenses of defending it. Colony Coal & Coke Corp. v. Commissioner, 4 Cir., 52

F.2d 923; Murphy Oil Co. v. Burnet, 9 Cir., 55 F.2d 17, 26; Moynier v. Welch, 9 Cir., 97 F.2d 471; Farmer v. Commissioner, 10 Cir., 126 F.2d 542; Schwabacher v. Commissioner, 9 Cir., 132 F.2d 516, 519. Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, is to be distinguished, for the payment was to defend the taxpayer's title to property which was itself income: i. e., shares of stock received in payment for services. If it was not an expense of the business, it was nothing; the cost of the shares could form no part in any equation relevant to taxation. But it is clearly a mistake to take the face of the claim as a test of whether a payment is a cost of defending a title. If the payment is to be reckoned as such, it must be in fact made for the purpose of relieving the property of some lien or other hostile interest. The mere fact that, if it were sound in law, it would establish such an interest, does not prove that the taxpayer has paid to defend his title; he may be completely confident that this is not peril; yet there may be other sound reasons for ridding himself of the suit. The cost of the mere contest may be more than the claimant is willing to accept; the mere pendency of the suit may disastrously affect the taxpayer's general credit. When that is the situation, the regulation does not cover, and the payment must be judged by some other measure. In the case at bar, if the Levitts were altogether satisfied with their lawyer's advice about Edelman's claim, if they settled with him only because they feared the effect of the publicity upon their credit, and so upon their business generally, the payment was not part of the cost of any of their property; though, whether it was an "ordinary and necessary" expense of the business, is another matter.

Neither its findings, nor its opinion, tell us what the Tax Court thought about this issue. The judge did indeed find that Edelman claimed an equitable interest in the taxpayer's property; and we agree, as we have said. But nowhere does it appear whether the judge credited the testimony that the taxpayer's officers were not in the least troubled as to the possible success of the suit, or whether they settled only because they feared the publicity. Without such a finding we cannot dispose of the case, unless we accept another finding of the court: i. e., that in any event the anticipated injury to the business was not certain to occur; and that, because it

798

was not, the outlay was not "necessary." That finding presupposes, however, an interpretation of the statute with which we do not agree.

 That such payments to protect a business generally are "ordinary" expenses is abundantly settled by authority and can no longer be questioned. Kornhauser v. United States, supra, 276 U.S. 145, 48 S. Ct. 219, 72 L.Ed. 505; Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 78 L.Ed. 212; Deputy v. DuPont, 308 U.S. 488, 495, 60 S. Ct. 363, 84 L.Ed. 416; Commissioner v. Heininger, 320 U.S. 467, 471, 64 S.Ct. 249. They are a familiar incident in businesses which prove successful after buying out the early owners: they are altogether "normal." Whether they are "necessary" depends upon questions on which the Tax Court did not pass, because of its misconception of the statute, as we understand it. We do indeed agree that "the mere belief that expediency justified the expense is insufficient to meet the statutory requirements of § 23(a) (1)." But the fact that "the greatly feared publicity, curtailment of credit, failing of liens and such, might not have resulted from the filing of an action by Edelman," while relevant as evidence, is not the critical fact. An expense to avoid such results may be "necessary," although the anticipated loss is not inevitable; business, like everything else, can only be conducted upon prophecies, and prophecies are never infallible. If in the case at bar the Levitts were right in thinking that Edelman's suit would be likely to have those effects upon its credit which they expected, that was enough; "necessary" in this connection only means necessary, if reasonable expectation proves well grounded. The case must therefore be remanded—since we have no power to make findings ourselves—and the Tax Court directed to make findings upon the three following questions. (1.) Was the taxpayer entirely confident that any suit which Edelman might bring could not succeed? (2.) Did it make the payment in question only for the purpose of avoiding the damage to its credit, its reputation and its business generally which might result from such a suit? (3.) Was any such fear which it may have had, so far justified that a reasonable person in its place would have thought a settlement at that figure less than the damage which would follow from such a suit? Upon the findings so made a new order will pass, which either party may challenge by a new appeal.

The payment was certainly not a loss within § 23(f). Kornhauser v. United States, supra, 276 U.S. 145, 152, 48 S.Ct. 219, 72 L.Ed. 505; Hales-Mullaly, Inc. v. Commissioner, 10 Cir., 131 F.2d 509, 512.

Order reversed; cause remanded for further proceedings in accordance with the foregoing.